1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| MUNEERAH CRAWFORD, | Case No. 19-cv-01573-LB |
| Plaintiff, | **ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND (2) DENYING DEFENDANTS' MOTION TO STRIKE** |
| v. | |
| KAISER FOUNDATION HEALTH PLAN, et al., | |
| Defendants. | Re: ECF No. 20, 23 |

**INTRODUCTION**

Plaintiff Muneerah Crawford brings this action against defendants Kaiser Foundation Health Plan and Kaiser Foundation Hospitals for allegedly violating the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.

EMTALA prohibits hospital emergency rooms from refusing to treat indigent or uninsured patients or discharging patients without first stabilizing their condition. Ms. Crawford alleges that on March 25, 2017, she went to the emergency room at the Kaiser Permanente hospital in Redwood City (the "Hospital") with respiratory distress. She was screened in the emergency room and admitted overnight. She alleges that in the morning, she could not breathe or physically walk out of the Hospital, but the Hospital told her that it was discharging her and that if she did not

leave, it would call the police. After the Hospital discharged her in the morning, she continued to deteriorate, suffered from septic shock and tachycardia, nearly died, and had to be taken in an ambulance on life support to another hospital that afternoon.

Ms. Crawford brings an EMTALA failure-to-stabilize claim against defendants Kaiser Foundation Health Plan ("Kaiser Health Plan") and Kaiser Foundation Hospitals ("Kaiser Hospitals"). The defendants move to dismiss, arguing that (among other things) the Hospital admitted Ms. Crawford as an inpatient and that EMTALA's stabilization requirement ends when a patient is admitted for inpatient care.[1] The defendants also move to strike portions of Ms. Crawford's complaint. Ms. Crawford responds that (1) the Hospital admitted her only as an "observation patient" — as opposed to admitting her for inpatient care — and thus EMTALA's stabilization requirement continued after her admission, and (2) the Hospital failed to stabilize her before discharging her.

The court held a hearing and now rules as follows. The court grants the defendants' motion to dismiss with respect to Kaiser Health Plan because a plaintiff can bring an EMTALA claim only against a hospital, and Kaiser Health Plan is not a hospital. The court denies the defendants' motion to dismiss with respect to Ms. Crawford's EMTALA failure-to-stabilize claims against Kaiser Hospitals because Ms. Crawford has cognizably pleaded in a non-conclusory manner that the Hospital did not admit her for inpatient care and did not stabilize her before discharging her. To the extent that Ms. Crawford is bringing any other claims, the court grants the defendants' motion to dismiss those claims because Ms. Crawford has not clearly and cognizably pleaded them. The court denies the defendants' motion to strike.

---

[1] The defendants argue that after a patient is admitted to a hospital for inpatient care, state-law negligence rules, not EMTALA, govern the hospital's standard of care. Ms. Crawford is not bringing a negligence claim here.

## STATEMENT[2]

### 1.  March 24, 2017

On March 24, 2017 at 9:17 p.m., plaintiff Muneerah Crawford was seen by a Dr. Ruiz at the Kaiser Permanente hospital in Redwood City.[3] Dr. Ruiz diagnosed her with pneumonia and reactive-airway disease and treated her with antibiotics and breathing treatments.[4] On March 25, 2017 at 12:22 a.m., the Hospital discharged Ms. Crawford and sent her home with prescriptions.[5] Ms. Crawford expressly alleges that she was "in stable condition" when she was discharged.[6] Dr. Ruiz told her to come back if her condition deteriorated.[7]

### 2.  March 25, 2017 – Screening

On March 25, 2017, at 7:10 p.m., Ms. Crawford returned to the Hospital emergency room.[8] She told Dr. Ruiz that she could not breathe out and that she had a fever, headache, and chest pain.[9] Dr. Ruiz ordered blood tests and heart tests and gave Ms. Crawford breathing treatments in the emergency room.[10] Among other tests, Dr. Ruiz ordered lactic-acid blood tests, which showed that Ms. Crawford's lactic-acid level rose to 1.8 that evening.[11]

At 7:36 p.m., Ms. Crawford's blood pressure was at 177/87, her pulse was 99, and her blood-oxygen level was at 91 percent.[12] After being treated with oxygen and breathing treatments, at

---

[2] Unless otherwise stated, the facts in the Statement are allegations from the First Amended Complaint ("FAC") and are presumed to be true for the purposes of this order.

[3] FAC – ECF No. 16 at 4 (¶ 5); FAC Ex. G (medical records) – ECF No. 16 at 36.

[4] FAC – ECF No. 16 at 4 (¶ 5).

[5] *Id.*

[6] *Id.*

[7] *Id.* (¶ 6).

[8] *Id.* (¶¶ 1, 7).

[9] *Id.* at 4 (¶ 7).

[10] *Id.* (¶ 8).

[11] *Id.* at 5–6 (¶¶ 18, 20).

[12] *Id.* at 4 (¶ 9).

9:00 p.m., her blood pressure was 164/83, her pulse was 70, and she remained short of breath.[13] Dr. Ruiz told her that she should stay in the Hospital for two or three days to get her breathing under control and so that the Hospital could treat her for pneumonia and stabilize her condition.[14] Ms. Crawford expressly alleges that she "was given an adequate screening in the Emergency Room[.]"[15]

### 3. March 25, 2017 – Admission

When Ms. Crawford was taken from the emergency room to be admitted, a Hospital employee confronted her about her medical insurance.[16] The Hospital employee told her that she should go to the county hospital.[17] Ms. Crawford responded that she could go to any hospital with Medicare and that she had been to the Hospital emergency room the previous night (March 24) and that the ER doctor (Dr. Ruiz) had told her to come back if her condition deteriorated.[18]

Ms. Crawford asserts that the Hospital then admitted her, but only as an "observation patient," as opposed to admitting her as a full inpatient.[19] She supports her assertion with the following factual allegations and documents.

First, Ms. Crawford attaches as exhibits to her complaint certain medical records she obtained from the Hospital. On one page, under a heading titled "Service & Length of Stay," the records say that her "Patient Class" was "Observation."[20] On another page, under a heading titled "Code Status," the records say, "[p]lan to monitor as observation since patient was discharged from the

---

[13] *Id.* at 4–5 (¶ 10).

[14] *Id.* at 5 (¶ 10).

[15] *Id.* at 9 (¶ 45).

[16] *Id.* at 5 (¶ 13).

[17] *Id.*

[18] *Id.*

[19] *Id.* at 5 (¶ 12), 6 (¶ 19).

[20] FAC Ex. A (medical records) – ECF No. 16 at 27.

ED and then came back."[21] On another page, under a heading titled "Admit to Hospital," the records say that her "Type of Admission" was "Observation."[22] (Five lines up, that third page also calls her an "Inpatient."[23])

Second, Ms. Crawford attaches as an exhibit to her complaint her Medicare statement of claims from her time at the Hospital. The statement says that the Hospital submitted claims for payment for "Hospital observation service, per hour."[24]

Third, Ms. Crawford alleges that after she was discharged, she asked the Hospital for a copy of her medical records and for a copy of a notice that she says that Medicare rules require the Hospital to give her.[25] The Hospital responded, "You were in Observation, we don't have to give you a Medicare notice!"[26]

Ms. Crawford was not told at the time that she was being admitted as an observation patient, as opposed to as an inpatient.[27] She claims that under federal and state law, the Hospital was required to give her an "Observation Notice" and did not do so.[28] She claims that if she had received these required notices, she could have appealed her discharge from the Hospital to the Medicare Quality Improvement Organizations.[29]

### 4. March 25, 2017 to March 26, 2017 – Post-Admission and Discharge

Ms. Crawford was taken to a room, and at about 10:30 p.m. that night (March 25), a respiratory therapist came and gave her breathing treatment.[30]

---

[21] *Id.* at 29.

[22] FAC Ex. B (medical records) – ECF No. 16 at 31.

[23] *Id.*

[24] FAC Ex. H (Medicare statement) – ECF No. 16 at 47–48, 55.

[25] FAC – ECF No. 16 at 11 (¶ 60).

[26] *Id.*

[27] *Id.* at 5 (¶ 12), 6 (¶ 24).

[28] *Id.* at 5 (¶ 12), 6 (¶ 22).

[29] *Id.* at 9 (¶ 48).

[30] *Id.* at 5 (¶ 14).

After the treatment, Ms. Crawford's breathing became worse.[31] Her blood pressure and pulse were not monitored the way that (she alleges) an inpatient's blood pressure and pulse would have been.[32]

At 12:00 a.m., Ms. Crawford called a nurse and asked the nurse to call a doctor.[33] The nurse recorded Ms. Crawford's pulse as being in the 30s.[34] At 12:15 a.m., a Dr. Abhyanker, the doctor on Ms. Crawford's case, came to see Ms. Crawford, conducted an examination, and told her to breathe with pursed lips.[35]

Dr. Abhyanker left at 12:30 a.m., after which no other doctors came to see Ms. Crawford that night.[36] At some unspecified point in time, Dr. Abhyanker discontinued the lactic-acid blood tests that Dr. Ruiz previously had ordered.[37]

On the morning of March 26 at 9:00 a.m., Ms. Crawford's roommate arrived at the Hospital.[38] Ms. Crawford was discussing her condition and the fact that no one had brought her breakfast, when a Hospital custodian arrived and started to mop the floor.[39] The custodian told Ms. Crawford that the Hospital had discharged her.[40]

Ms. Crawford asked the custodian to get a doctor or a nurse.[41] A nurse arrived and confirmed that Ms. Crawford had been discharged.[42]

---

[31] *Id.*

[32] *Id.* at 6 (¶ 23).

[33] *Id.* at 5 (¶ 15).

[34] *Id.*

[35] *Id.* (¶ 16).

[36] *Id.* (¶ 17).

[37] *Id.* at 6 (¶ 20).

[38] *Id.* (¶ 26).

[39] *Id.* (¶ 27).

[40] *Id.*

[41] *Id.* at 7 (¶ 28).

[42] *Id.*

Ms. Crawford demanded to see her doctor.[43] The nurse called someone on a telephone and handed the phone to Ms. Crawford.[44] The person on the other end told Ms. Crawford that she had been discharged and told her that she was fine, that she was just having bronchial spasms, and that she should go home.[45] Ms. Crawford demanded to see a doctor, and the person on the phone hung up.[46]

Ms. Crawford told the nurse that she could not walk across the street and that she was not okay and again demanded to see a doctor.[47] The nurse responded that if Ms. Crawford did not leave, the Hospital would call the police.[48] Ms. Crawford alleges that she was ill to the point that she could not argue with Hospital about being discharged.[49] She left the Hospital at approximately 10:30 a.m.[50] She was physically unable to walk out of the Hospital and had to be taken to her car.[51] As she left, her condition and breathing got worse, because she was no longer on oxygen.[52]

## 5. Subsequent Events

At approximately 4:30 p.m. that afternoon (March 26), Ms. Crawford's breathing worsened, and she called 911.[53] An ambulance transported her on life support to Stanford Hospital in Palo Alto at approximately 5:15 p.m.[54]

---

[43] *Id.*

[44] *Id.*

[45] *Id.* (¶ 29).

[46] *Id.*

[47] *Id.* (¶ 30).

[48] *Id.*

[49] *Id.* at 15 (second ¶ 4).

[50] *Id.* at 7 (¶ 31).

[51] *Id.* at 7 (¶¶ 30–31), 15 (second ¶ 4).

[52] *Id.* at 7 (¶ 31).

[53] *Id.* (¶ 32).

[54] *Id.*

When she arrived at Stanford Hospital, her lactic-acid level was at 2.17 and continued to rise to 4.16.[55] She discovered for the first time at Stanford that her repeated treatments with bronchodilators had caused her lactic-acid levels to rise.[56] She was in septic shock, suffering from tachycardia, and had deteriorated to the point that she nearly died.[57]

## STANDARD OF REVIEW

### 1. Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

---

[55] *Id.* at 9 (¶ 47).

[56] *Id.* at 6 (¶ 18).

[57] *Id.* at 9 (¶ 47), 15 (second ¶ 5).

United States District Court
Northern District of California

"A pro se complaint must be 'liberally construed,' since 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Entler v. Gregoire*, 872 F.3d 1031, 1038 (9th Cir. 2017) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

If a court dismisses a complaint, it should give leave to amend unless the "pleading could not possibly be cured by the allegation of other facts." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016) (citations and internal quotation marks omitted).

## 2. Motion to Strike

A "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Motions to strike are regarded with disfavor, as they are often used as delaying tactics, and should not be granted 'unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.'" *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 888 (N.D. Cal. 2012) (quoting *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991)). "In the Ninth Circuit, motions to strike are proper, even if the material is not prejudicial to the moving party, if granting the motion would make trial less complicated or otherwise streamline the ultimate resolution of the action." *Id.* (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds*, 510 U.S. 517 (1994)). "When considering a motion to strike, a court must view the pleadings in a light most favorable to the non-moving party." *Id.* (citing *California ex rel. State Lands Comm'n v. United States*, 512 F. Supp. 36, 39 (N.D. Cal. 1981)). The ultimate decision under Rule 12(f) lies within the sound discretion of the court. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018).

**ANALYSIS**

1. **Motion to Dismiss**

   1.1    **Governing Law**

"EMTALA imposes two duties on hospital emergency rooms: a duty to screen a patient for an emergency medical condition, and, once an emergency condition is found, a duty to stabilize the patient before transferring or discharging him." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 992 (9th Cir. 2001) (citing 42 U.S.C. § 1395dd; *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254–55 (9th Cir. 2001)). Ms. Crawford expressly disclaims bringing a claim based on EMTALA's screening requirement.[58] The issue here thus is only whether the defendants complied with EMTALA's stabilization requirement.

EMTALA defines an "emergency medical condition" in relevant part as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in —
>
> (i) placing the health of the individual . . . in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A). Under EMTALA,

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either —
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1). EMTALA defines "to stabilize" in relevant part as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical

---

[58] *See* FAC – ECF No. 16 at 9 (¶ 45) ("Muneerah Crawford was given an adequate screening in the Emergency Room"); Pl. Opp'n – ECF No. 31 at 4 ("Plaintiff never alleges that she did not receive an adequate screening under EMTALA, she is stating the fact that Kaiser did not provide stabilizing treatment while she was admitted into [t]he hospital, not the Emergency Room while under Observation Care.").

probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A).

EMTALA further provides that "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section),[59] the hospital may not transfer the individual," absent certain exceptions not at issue here. 42 U.S.C. § 1395dd(c)(1). The term "transfer" includes discharging a patient from a hospital. 42 U.S.C. § 1395dd(e)(4).

The Centers for Medicare & Medicaid Services, an agency within the Department of Health and Human Services, promulgated regulations interpreting key EMTALA provisions. *See* 42 C.F.R. § 489.24. The regulations provide that EMTALA's stabilization requirement does not apply to patients who have been admitted as an inpatient for further treatment:

> If an emergency medical condition is determined to exist, [the hospital must] provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as defined in paragraph (e) of this section. If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section.
>
> . . . .
>
> If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24(a)(1)(ii), (d)(2)(i).

As the Ninth Circuit has explained, "EMTALA's stabilization requirement ends when an individual is admitted for inpatient care." *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1168 (9th Cir. 2002). "Congress enacted EMTALA 'to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat' and not to 'duplicate preexisting legal protections.'" *Id.* at 1168–69 (quoting *Gatewood v. Wash. Healthcare Corp.*, 933

---

[59] The term "stabilized" is consistent "to stabilize," meaning, no material deterioration of the medical emergency is likely to occur during transfer. *See* 42 U.S.C. § 1395dd(e)(3)(A), (B).

F.2d 1037, 1041 (D.C. Cir. 1991) and citing other cases). "After an individual is admitted for inpatient care, state tort law provides a remedy for negligent care." *Id.* at 1169. "If EMTALA liability extended to inpatient care, EMTALA would be 'converted into a federal malpractice statute, something it was never intended to be.'" *Id.* (internal brackets and ellipsis omitted) (quoting *Hussain v. Kaiser Found. Health Plan*, 914 F. Supp. 1331, 1335 (E.D. Va. 1996)).

Ms. Crawford does not dispute that EMTALA's stabilization requirement ends when a patient is admitted for inpatient care.[60] What she argues is that she was admitted only as an "observation patient," as opposed to for inpatient care, and that EMTALA's stabilization requirement does not end when an individual is admitted for observation the way it does when an individual is admitted for inpatient care.[61]

Neither side cites any cases specifically addressing the distinction between admission as an observation patient versus admission for inpatient care.[62] The court's research has identified only one case that has addressed this issue in any depth. *See Dicioccio v. Chung*, 232 F. Supp. 3d 681 (E.D. Pa. 2017). The court there held:

> EMTALA's text is ambiguous regarding whether [plaintiff]'s admission for observation cuts off liability, and there is a dearth of case law on the subject as well. However, regulations bearing on this issue have been promulgated by the Centers for Medicare & Medicaid Services ("CMS"), the agency within the Department of Health and Human Services responsible for implementing EMTALA. "CMS has the congressional authority to promulgate rules and regulations interpreting and implementing Medicare-related statutes such as EMTALA," and courts generally "defer to a government agency's administrative interpretation of a statute unless it is contrary to clear congressional intent." Here, both parties cite the CMS regulations in support of their positions, and neither argues that the Court should not defer to them.

---

[60] FAC – ECF No. 16 at 14 (second ¶ 3) ("Admission to the hospital as a[n] 'in patient['] under Medicare rules ends EMTALA liability unless the patient is admitted for observation care only.") (capitalization removed).

[61] *Id.*; Pl. Opp'n – ECF No. 31 at 8 (¶ 23).

[62] Despite Ms. Crawford's raising in her complaint and her opposition this distinction between admission for observation and admission for inpatient care, the defendants do not address it head on. *Cf.* Defs. Mot. to Dismiss – ECF No. 20 at 8–9 (arguing that "EMTALA liability ends where the patient is admitted for inpatient care" but not addressing whether admission for observation constitutes admission for inpatient care); Defs. Mot. to Dismiss Reply – ECF No. 35 at 4 (generally same).

The CMS regulations provide a limited exception to EMTALA's obligations, but only in the event that a hospital "admits [an] individual *as an inpatient*." The relevant CMS Final Rule, issued in 2003, also makes clear that CMS interprets "hospital obligations under EMTALA as ending once the individuals *are admitted to the hospital inpatient care*." Nowhere do the regulations state that admission for observation similarly ends a hospital's EMTALA obligations. To the contrary, later CMS interpretative guidance makes clear that observation status does *not* qualify as inpatient admission for purposes of EMTALA liability. In 2009, CMS explained: "Individuals who are placed in observation status are not inpatients, even if they occupy a bed overnight. Therefore, *placement in an observation status of an individual . . . does not terminate the EMTALA obligations of that hospital or a recipient*." The Court gives "substantial deference" to CMS's "interpretation of its own regulations," and concludes that [plaintiff]'s admission for observation did not end [defendant]'s EMTALA obligations.

This conclusion is reinforced by CMS's Healthcare Benefit Policy Manual, in which CMS expressly defines "observation status" as an outpatient status, as opposed to an inpatient status. The Manual explains that "[t]he purpose of observation is to determine the need for further treatment or for inpatient admission" and "a patient receiving observation services may improve and be released, or be admitted as an inpatient." "Observation" status thus differs from "inpatient" status in that it is used to determine whether an individual should be admitted as an inpatient or discharged; it is not simply another form of inpatient admission with different insurance consequences, as [defendant] suggests. It therefore makes sense to distinguish between admission for observation and inpatient admission for purposes of determining EMTALA liability.

. . . .

. . . . [A]s explained in the CMS Policy Manual, observation status is not the same as inpatient admission, but is used to determine *whether* a patient should be admitted for further treatment or discharged. "In other words, observation is sometimes necessary in order to identify whether a hospital would be violating EMTALA by releasing or transferring a particular patient." Holding that admission for observation bars EMTALA liability would thus create an end-run around the statute by allowing hospitals to place patients in a limbo-like observation status without stabilizing them, secure in the knowledge that they could discharge the patient at any point, regardless of their condition, without incurring EMTALA liability. This would condone, if not encourage, the practice of "patient dumping" that EMTALA was designed to prevent.

*Id.* at 687–90 (emphasis in original, citations omitted); *accord Bryant*, 289 F.3d at 1169 ("[i]n general, . . . a hospital admits a patient to provide inpatient care," but "a hospital cannot escape liability under EMTALA by ostensibly 'admitting' a patient, with no intention of treating the patient, and then discharging or transferring the patient without having met the stabilization requirement").

### 1.2    Application

"The plain text of [] EMTALA explicitly limits a private right of action to the participating hospital." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1256 (9th Cir. 1995). Ms. Crawford cannot maintain an EMTALA claim against Kaiser Health Plan, which is not a hospital. The court therefore grants Kaiser Health Plan's motion to dismiss and addresses only Ms. Crawford's allegations against Kaiser Hospitals.

Additionally, Ms. Crawford disclaims bringing a claim against Kaiser Hospitals for (1) failure to stabilize with respect to her treatment on March 24, 2017 or (2) failure to screen (at any time).[63] The court therefore addresses only Ms. Crawford's allegations that Kaiser Hospitals failed to stabilize her on March 25 and 26, 2017.

### 1.2.1    EMTALA failure-to-stabilize claim against Kaiser Hospitals

With respect to Ms. Crawford's EMTALA failure-to-stabilize claim, Kaiser Hospitals first argues that Ms. Crawford was admitted as an inpatient, which ends EMTALA's stabilization requirement.[64] But Ms. Crawford asserts that she was admitted for "observation" and not admitted as an inpatient.[65] Ms. Crawford supports her assertion with specific factual allegations and documents, namely, (1) the Hospital's own medical records, which say that she was admitted for "observation,"[66] (2) her Medicare statement of claims, which say that the Hospital submitted claims for payment for "Hospital observation service, per hour,"[67] and (3) an allegation that the Hospital refused to provide Ms. Crawford with a Medicare notice that it otherwise would have had to provide her on the ground that it had admitted her only as an observation patient.[68] This is not a case where a plaintiff's claims that she was admitted for observation and not for inpatient care are

---

[63] *See* FAC – ECF No. 16 at 4 (¶ 5), 9 (¶ 45); Pl. Opp'n – ECF No. 31 at 4 (¶ 8).

[64] Defs. Mot. to Dismiss – ECF No. 20 at 8–9; Defs. Mot. to Dismiss Reply – ECF No. 35 at 4.

[65] FAC – ECF No. 16 at 5 (¶ 12), 6 (¶ 19).

[66] FAC Ex. A (medical records) – ECF No. 16 at 27, 29; FAC Ex. B (medical records) – ECF No. 16 at 31.

[67] FAC Ex. H (Medicare statement) – ECF No. 16 at 47–48, 55.

[68] FAC – ECF No. 16 at 11 (¶ 60) (alleging that when she asked the Hospital for her Medicare notice, the Hospital responded, "You were in Observation, we don't have to give you a Medicare notice!").

conclusory and unsupported by plausible factual allegations. Ms. Crawford cognizably alleges in a non-conclusory manner that the Hospital admitted her only as an observation patient and not for inpatient care.

Kaiser Hospitals argues that it admitted Ms. Crawford as a full inpatient.[69] This presents a factual dispute that the court cannot decide on a motion to dismiss. *Cf. Dicioccio*, 232 F. Supp. 3d at 690–91 ("whether the care [plaintiff] received in observation was substantially similar to the care he would have received had he been admitted as an inpatient" presents "at least a general factual dispute"). Kaiser Hospitals fails to address squarely whether admission for observation ends EMTALA's stabilization requirement in the same way that admission for inpatient care does. The court denies Kaiser Hospitals' motion to dismiss on this ground. *Cf. id.* at 687–90.

Kaiser Hospitals next argues that Ms. Crawford's allegations that the Hospital detected that she had a medical emergency are conclusory.[70] The court disagrees. Ms. Crawford cognizably alleges that the Hospital diagnosed her with pneumonia, elevated blood pressure, and shortness of breath, and that the doctor who screened her in the emergency room (Dr. Ruiz) said that she should stay in the Hospital for two to three days to get her breathing under control and so that the Hospital could stabilize her condition.[71] Kaiser Hospitals asserts as a conclusion that "[n]o emergency medical condition was diagnosed,"[72] but it does not adequately support this assertion[73]

---

[69] Kaiser Hospitals notes that Ms. Crawford's medical records in one place say that she was an "Inpatient." FAC Ex. B (medical records) – ECF No. 16 at 31. That same page, however, also says that her "Type of Admission" was "Observation." *Id.* This document does not render implausible Ms. Crawford's allegation that the Hospital admitted her only for observation and not to provide inpatient care.

[70] Defs. Mot. to Dismiss – ECF No. 20 at 10–11.

[71] FAC – ECF No. 16 at 4–5 (¶ 10).

[72] Defs. Mot. to Dismiss – ECF No. 20 at 11.

[73] Kaiser Hospitals appears at times to misstate Ms. Crawford's allegations and the medical records she cites. For example, it claims that on March 25, 2017, Ms. Crawford "was not diagnosed with an emergency by Dr. Ruiz, but with community acquired pneumonia which had improved from the prior night." Defs. Mot. to Dismiss – ECF No. 35 at 5 (citing FAC Ex. A-II (medical records) – ECF No. 16 at 24). The page of Dr. Ruiz's notes that Kaiser Hospitals cites actually states, "Please see my note from yesterday. [Ms. Crawford was s]een with community acquired pneumonia and wheezing, received prednisone, vceftin, and azithromycin, [and] now returns with *increasing* shortness of breath

and does not cite any cases that support its contention that the pneumonia, elevated blood pressure, and shortness of breath that Ms. Crawford presented were not "emergency medical conditions" under EMTALA.[74]

Kaiser Hospitals next argues that it stabilized Ms. Crawford, thereby satisfying its obligations under EMTALA, and that Ms. Crawford's medical records (which she attached as exhibits to her complaint) "contradict[] her statements that she was not stabilized."[75] Kaiser Hospitals claims that "[h]er pneumonia was treated with Tamiflu and blood cultures were performed" and that "[h]er reactive airway disease (asthma) was treated with steroids and ATC Atrovent" to argue that its sufficiently stabilized her.[76] This argument fails. First, even assuming that the court were to take judicial notice of the medical records, Kaiser Hospitals' characterization of the records is questionable.[77] Second, even adopting Kaiser Hospitals' characterization, the medical records' recitation of the treatments the Hospital provided to Ms. Crawford does not establish on a motion to dismiss that those treatments were sufficient to stabilize her. *Cf. Lozoya v. Anderson*, No. 07cv2148-IEG-WMc, 2008 WL 2476187, at *3 (S.D. Cal. June 17, 2008) ("On a motion to dismiss, without any factual development, it is premature to decide whether the [hospital's treatment] constituted the treatment 'necessary to assure within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer

---

this evening with wheezing and purulent sputum with slight blood." FAC Ex. A-II (medical records) – ECF No. 16 at 24 (emphasis added).

[74] *See* Defs. Mot. to Dismiss – ECF No. 20 at 11 (citing no cases); Defs. Mot. to Dismiss Reply – ECF No. 35 at 4 (same).

[75] Defs. Mot. to Dismiss Reply – ECF No. 35 at 7.

[76] *Id.* at 8.

[77] For example, Kaiser Hospitals cites Ms. Crawford's medical records to argue that "[h]er pneumonia was treated with Tamiflu and blood cultures were performed." Defs. Mot. to Dismiss Reply – ECF No. 35 at 8 (citing FAC Ex. A (medical records) – ECF No. 16 at 29). The records also appear to indicate, however, that (1) the Hospital determined that it should treat Ms. Crawford with Tamiflu until her blood cultures came back negative, FAC Ex. A – ECF No. 16 at 29, (2) there was no Tamiflu available so it did not actually treat her with Tamiflu, *id.* at 26, and (3) it discharged her before her blood cultures came back, FAC Ex. C (medical records) – ECF No. 16 at 32. Perhaps the court is misreading the medical records. But it is also possible that Kaiser Hospitals is misreading them. The court cannot make a factual determination regarding the full extent of the care that Ms. Crawford received from these medical records alone.

or discharge of the individual from a facility.'") (internal brackets omitted) (quoting 42 U.S.C. § 1395dd(e)(3)(A)). Ms. Crawford cognizably alleges that the Hospital did not stabilize her condition after she came to the emergency room — and that when the Hospital discharged her the next morning, she was still suffering from the condition that the Hospital originally diagnosed (an inability to breathe) and was physically unable to walk out of the Hospital on her own.[78] This plausibly alleges an EMTALA failure-to-stabilize claim. *Cf. Munoz v. Watsonville Cmty. Hosp.*, No. 15-cv-00932-BLF, 2017 WL 363330, at *5–6 (N.D. Cal. Jan. 25, 2017) (allegation that the patient had severe pain, that the hospital diagnosed her as having severe pain, and that the hospital provided drugs that did not stabilize her pain and then discharged her, pleaded an EMTALA failure-to-stabilize claim); *Gutierrez v. Santa Rosa Mem'l Hosp.*, No. 16-cv-02645-SI, 2016 WL 5930587, at *3 (N.D. Cal. Oct. 12, 2016) (even if the hospital performed numerous tests on the patient, allegations that it ignored the results of the tests and discharged the patient without stabilizing her emergency medical conditions pleaded an EMTALA failure-to-stabilize claim).[79]

Kaiser Hospitals cites several cases where courts have granted summary judgment in favor of a hospital on EMTALA claims.[80] Those cases are inapposite on this motion to dismiss. *Cf. Gutierrez*, 2016 WL 5930587, at *3 (denying a motion to dismiss an EMTALA failure-to-stabilize claim and distinguishing as inapposite "cases . . . in which courts held that the defendant hospitals did not have a duty to stabilize [that] were all decided on a full factual record on summary judgment") (citing cases).[81]

---

[78] FAC – ECF No. 16 at 7 (¶ 30), 15 (second ¶ 4).

[79] Kaiser Hospitals argues that Ms. Crawford herself alleges that the Hospital told her that she was "fine" when it discharged her and that she thus cannot plead an EMTALA failure-to-stabilize claim. Defs. Mot. to Dismiss – ECF No. 20 at 11; *see* FAC – ECF No. 16 at 7 (¶ 29) (Ms. Crawford's alleging that the Hospital told her, "You[']r[e] fine, go home"). It cites no cases that support its argument that a hospital's own, perhaps self-serving, statement that a patient is "fine" establishes on a motion to dismiss that the hospital has stabilized the patient. Were this the case, it would render EMTALA's stabilization requirement a dead letter, as a hospital could insulate itself from liability simply by telling all of its patients that they are "fine" as it discharges them.

[80] *See, e.g.*, Defs. Mot. to Dismiss – ECF No. 20 at 9–10 (citing *Hoffman v. Tonnemacher*, 425 F. Supp. 2d 1120 (E.D. Cal. 2006), a summary-judgment case).

[81] At the hearing on its motion to dismiss, Kaiser Hospitals emphasized *Williams v. Birkeness*, 34 F.3d 695 (8th Cir. 1994). That case is inapposite. Not only was *Williams* a summary-judgment case, not a

Kaiser Hospitals stresses that EMTALA is not a negligence statute and does not create a federal malpractice cause of action or establish a federal standard of care.[82] That is true. *Bryant*, 289 F.3d at 1166 ("EMTALA . . . was not enacted to establish a federal medical malpractice cause of action nor to establish a national standard of care.") (citing cases). A plaintiff may not "backdoor" a general negligence theory through an EMTALA failure-to-stabilize claim. *Cf. Munoz*, 2017 WL 363330, at *5 (cautioning plaintiff "to stay clear from a medical malpractice claim and to focus on proving the EMTALA claim of failing to stabilize"). Ms. Crawford is limited in her EMTALA claim to a theory that Kaiser Hospitals failed to stabilize her; if it did stabilize her, any further disagreement that she might have with the treatment she received is not actionable under EMTALA. But at this juncture, she has sufficiently pleaded that Kaiser Hospitals discharged her without stabilizing her and thus has sufficiently pleaded an EMTALA claim. The court denies Kaiser Hospitals' motion to dismiss.

### 1.2.2  Ancillary issues

Ms. Crawford raises several ancillary issues in her complaint, including that:

1.  the Hospital "confronted" her about what medical insurance she had,[83]

2.  the Hospital did not provide her with a notice that it was admitting her as an "observation patient," allegedly in violation of federal and state law,[84]

3.  the Hospital misbilled her Medi-Cal insurance without first billing her Medicaid insurance,[85] and

4.  the Hospital falsified her medical records.[86]

---

motion-to-dismiss case, it involved an EMTALA failure-to-screen claim, not a failure-to-stabilize claim. *See id.* at 697.

[82] Defs. Mot. to Dismiss – ECF No. 20 at 3.

[83] *See, e.g.*, FAC – ECF No. 16 at 4 (¶ 2), 5 (¶ 13), 8 (¶ 38).

[84] *See, e.g.*, *id.* at 5 (¶ 12), 6 (¶¶ 22, 24), 8 (¶ 40).

[85] *See, e.g.*, *id.* at 11 (¶ 57).

[86] *See, e.g.*, *id.* at 10 (¶¶ 51–53)

It is not clear whether she raises these issues simply to provide context to her EMTALA failure-to-stabilize claim or if she intended to plead them as separate claims. The defendants moved to dismiss them.[87] Ms. Crawford did not advance any arguments in opposition.[88] To the extent that they were meant to be separate claims, the court dismisses them without prejudice. Should Ms. Crawford want to file a motion to amend her complaint to re-add them, the court advises her that she must clearly articulate what claims she is bringing and what rights she claims were violated. Fed. R. Civ. P. 8(a)(2) (a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"); *cf. Gonzalez-Trapaga v Mayaguez Med. Ctr. Dr. Ramon Emeterio Betances, Inc.*, No. 15-1342 (DRD), 2016 WL 1261056, at *19 (D.P.R. Mar. 30, 2016) (dismissing claims based on 42 C.F.R. §§ 489.20 and 489.24 where the plaintiff did not tie his claims to an alleged violation of 42 U.S.C. § 1395dd and did not identify any statute that granted a private right of action for violating those regulations); *see generally Blessing v. Freestone*, 520 U.S. 329, 342 (1997) (directing plaintiffs to identify what rights they were claiming where they generally claimed rights under an undifferentiated statute but did not clearly define those rights).

## 2. Motion to Strike

Motions to strike are disfavored, and the defendants have not met the standard for a motion to strike here.

The defendants first move to strike legal arguments in Ms. Crawford's First Amended Complaint that respond to the defendants' motion to dismiss her original complaint.[89] The defendants argue that they will be prejudiced by having to respond to Ms. Crawford's

---

[87] Defs. Mot. to Dismiss – ECF No. 20 at 12–14; *see also* Def. Mot. to Dismiss Reply – ECF No. 35 at 8–10.

[88] *See* Pl. Opp'n – ECF No. 31 at 1 (¶ 1) (opposing only with respect to her EMTALA failure-to-stabilize claim); *see generally* Pl. Opp'n – ECF No. 31.

[89] Defs. Mot. to Strike – ECF No. 24 at 8–9.

arguments.[90] As the motion-to-dismiss briefing is now complete, that issue is moot. The defendants maintain that Ms. Crawford did not file an opposition to their motion to dismiss her original complaint and contend that she thus is time-barred from raising arguments that she could have (but did not) raise then.[91] This assertion fails. Under Federal Rule of Civil Procedure 15(a)(1), Ms. Crawford had a right to amend her complaint once as a matter of course within 21 days after the defendants filed their original motion to dismiss. The point of Rule 15(a)(1) is to allow a plaintiff to "amend[] to meet the arguments in the motion" without having to fully litigate the motion. Fed. R. Civ. P. 15 advisory committee's note to 2009 amendment ("A responsive amendment may avoid the need to decide the motion or reduce the number of issues to be decided, and will expedite determination of issues that otherwise might be raised seriatim."). Ms. Crawford timely filed a First Amended Complaint as a matter of course to address the defendants' motion to dismiss her original complaint, as Rule 15 contemplated. Her failure to file an opposition to the defendants' motion before filing her First Amended Complaint does not provide the defendants with a basis for moving to strike any portion of the First Amended Complaint.

The defendants next move to strike Ms. Crawford's claim against Kaiser Health Plan on the ground that she cannot pursue an EMTALA claim against a non-hospital.[92] As discussed above, the court is dismissing that claim. The defendants have not established why it is necessary beyond that to strike any portion of the complaint.

The defendants next move to strike allegations that (so they argue) do not go directly to Ms. Crawford's EMTALA failure-to-stabilize claim, such as allegations about the Hospital's "confronting" her about her insurance or failing to provide her with a notice of her "observation patient" status.[93] As discussed above, to the extent Ms. Crawford is attempting bringing separate claims on those theories, the court dismissed those claims. The defendants have not established why it is necessary beyond that to strike those allegations. *Cf. Cayo v. Valor Fighting & Mgmt.*

---

[90] *Id.* at 9.

[91] *Id.* at 8–9.

[92] *Id.* at 9.

[93] *Id.* at 9–11.

*LLC*, No. C 08-4763 CW, 2009 WL 1626586, at *5 (N.D. Cal. June 8, 2009) (denying a motion to strike allegations relating to dismissed claim as unnecessary and because the allegations might be relevant as factual context for the surviving claims).

Finally, the defendants move to strike or cap Ms. Crawford's request for damages on the ground that her damages claims are barred as a matter of law.[94] "Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974–75 (9th Cir. 2010). If the defendants want to dismiss Ms. Crawford's damages claims, they can file a Rule 12(c) or a Rule 56 motion (or, if Ms. Crawford files an amended complaint, a new Rule 12(b)(6) motion). *Cf. id.* at 974.[95]

## CONCLUSION

The court grants in part and denies in part the defendants' motion to dismiss. The court dismisses Ms. Crawford's claims against Kaiser Health Plan. The court does not dismiss Ms. Crawford's EMTALA failure-to-stabilize claim against Kaiser Hospitals. To the extent that Ms. Crawford is bringing any other claims, the court dismisses those claims without prejudice.

The court denies the defendants' motion to strike.

**IT IS SO ORDERED.**

Dated: July 19, 2019

_____
LAUREL BEELER
United States Magistrate Judge

---

[94] *Id.* at 11–13

[95] While the court does not address the damages issue further at this juncture, it does note that it questions the defendants' assertions regarding damages. For example, the defendants claim that "California's $250,000 statutory damages cap applies to Plaintiff's claimed damages," citing *Jackson v. East Bay Hospital*, 980 F. Supp. 1341, 1347 (N.D. Cal. 1997). Defs. Mot. to Strike – ECF No. 24 at 12–13. What *Jackson* actually said was that California's "damages cap does *not* apply to the recovery of damages under an EMTALA cause of action." *Jackson*, 980 F. Supp. at 1350 (emphasis added). The court expresses no opinion here as to whether *Jackson* is good law or whether California's damages cap does or does not apply — it simply notes that *Jackson* did not say what the defendants say it said.