United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

MUNEERAH CRAWFORD,

Plaintiff,

v.

KAISER FOUNDATION HOSPITALS,

Defendant.

Case No. 19-cv-01573-LB

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: ECF No. 76, 117

**INTRODUCTION**

Plaintiff Muneerah Crawford, who is representing herself, sued defendant Kaiser Foundation Hospitals on the ground that it violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, by not stabilizing her before it discharged her from Kaiser's emergency room in March 2017.[1] Kaiser moved for summary judgment on the ground that it admitted her overnight for observation, treated her, and stabilized her before discharge.[2] The court can decide the motion without oral argument. Civil L. R. 7-1(b). The court grants the motion.

[1] First Am. Compl. ("FAC")– ECF No. 16 at 4 (¶ 7); Order – ECF No. 42 (dismissing action against co-defendant Kaiser Foundation Health Plan because it is not a hospital subject to suit under EMTALA). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 76 at 22–29.

**STATEMENT**

The following sections summarize (1) Ms. Crawford's first visit to Kaiser on March 24, 2017, (2) her second visit on March 25, 2017 and her discharge on March 26, 2017, (3) her subsequent visit to Stanford Hospital, (4) additional information from expert Hugh West, M.D., and (5) relevant procedural history.

**1. March 24, 2017 Kaiser Visit**

On March 24, 2017, at around 9:17 p.m., Ms. Crawford went to Kaiser's emergency department in Redwood City, California, complaining of "difficulty breathing" and presenting with "shortness of breath, cough, wheezing, and colored sputum, without chest pain or rales in her breathing."[3] Frank Ruiz, M.D., examined and treated Ms. Crawford, documenting her allergy to Albuterol and her previous splenectomy, "which could potentially make a patient more prone to a bacterial infection."[4] He ordered tests, including blood cultures,[5] lactic acid,[6] peak flow, Chem-7,[7] CBC-diff,[8] BNP, troponin, a chest X-Ray, and an electrocardiogram ("ECG").[9] The emergency-department nurse checked on her regularly throughout her stay.[10] Dr. Ruiz diagnosed

---

[3] Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 12, 14; Ruiz Decl. – ECF No. 77 at 246 (¶ 8). The court considers the properly authenticated medical records at summary judgment. Fed. R. Evid. 803(6) & 901(b)(4); *United States v. Hall*, 419 F.3d 980, 987 (9th Cir. 2004). "Rales" are "[a]bnormal 'crackling' noises in the lungs which resemble crumpling tissue paper close to the ear and which arise from fluid in the alveoli. These sounds may occur in pneumonia or congestive heart failure." West Decl. – ECF No. 77 at 271.

[4] Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 16, 18; Ruiz Decl. – ECF No. 77 at 247 (¶ 8).

[5] A blood culture tests the presence of bacteria in the blood. West Decl. – ECF No. 77 at 274.

[6] "High levels of lactate in the serum (lactic acidosis) derive from inadequate oxygen for a given physiologic state. . . . Causes of lactic acidosis may include strenuous exercise . . . as well as shock states such as dehydration, trauma, and sepsis. . . . Lactic acid is usually considered abnormal in most laboratories with levels above 2.0." *Id*. at 275.

[7] A Chem-7 Panel tests "sodium, potassium, chloride, bicarbonate, blood urea nitrogen, creatinine, and glucose, which may indicate acute conditions requiring stabilizing treatment." *Id*. at 274.

[8] A test for Complete Blood Count ("CBC") "measures the number of blood cells and their morphology (shape) which could indicate, for example, anemia. . . . Counts that measure abnormally high or low against a normal range may indicate an emergency medical condition." *Id*.

[9] Ruiz Decl. – ECF No. 77 at 247 (¶ 10).

[10] Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 16–17.

Ms. Crawford with community-acquired pneumonia and wheezing from a reactive-airway disease (asthma), noting that she appeared mildly distressed and had slight respiratory distress and wheezes, with no rales.[11] The chest X-Ray showed "slight interstitial infiltrate in the right infrahilar region," possibly indicating a local infection, "but since there was no excess fluid or air in the lungs," it was a mild infection that could be treated at home with prescription medication.[12] The X-Ray and the EKG did not show signs of a pulmonary embolism or a myocardial infarction.[13] Her physical exam showed otherwise normal results, including unremarkable vital signs, oxygen saturation at 93%, and a lactic-acid level of 1.3.[14] A few days later, her blood culture came back negative for any pathogens.[15] Dr. Ruiz treated her with Ipratropium and Prednisone for her wheezing and Cefurozime and Azithromycin for her pneumonia.[16] He said that her symptoms were exacerbated by anxiety, and, based on his examination and Ms. Crawford's history and response to his treatment, he concluded that she was not suffering from an emergency condition and did not need further emergency-medical attention.[17]

At around 12:22 a.m. on March 25, 2019, Dr. Ruiz discharged Ms. Crawford because her "vital signs were unremarkable, she was ambulatory, and her conditions had improved."[18] She also said that she wanted to go home.[19] Dr. Ruiz prescribed Atrovent, Ceftin, Zithromax, and Deltasone at discharge (handing her the prescriptions), provided instructions for home care, and told her to "contact her primary care provider [the Health Plan of San Mateo] within three days for follow-up radiograms to ensure her infection resolved."[20]

---

[11] *Id.* at 19–20; Ruiz Decl. – ECF No. 77 at 248 (¶ 12).

[12] Ruiz Decl. – ECF No. 77 at 247 (¶ 12); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 19.

[13] Ruiz Decl. – ECF No. 77 at 247 (¶ 10).

[14] *Id.*; Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 19.

[15] Ruiz Decl. – ECF No. 77 at 247 (¶ 11).

[16] *Id.* (¶ 9).

[17] *Id.* at 247–48 (¶ 12).

[18] *Id.* at 248 (¶ 14).

[19] *Id.*; Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 17.

[20] Ruiz Decl. – ECF No. 77 at 248 (¶¶ 12–13).

United States District Court
Northern District of California

**2. March 25, 2017 Kaiser Visit**

On March 25, 2017, at around 7:27 p.m., Ms. Crawford returned to the Kaiser emergency department, complaining of shortness of breath, a cough, wheezing, and blood in her sputum.[21] Her blood pressure and respiration rate were "slightly high, despite normal oxygen saturation on room air and a normal, though slightly elevated, heart rate."[22] She had not taken the prescribed Atrovent.[23] She was given a peak flow, Atrovent, intravenous medication, a second chest X-Ray, a second ECG, lactic-acid measurements (to be discontinued once her result was less than the normal 2.0), a troponin test, a Chem-7 test, complete blood counts with automated differential, and a white blood-cell count with automated differential.[24] Her lactic-acid levels were 1.8, below the normal 2.0, and lactic-acid testing thus was discontinued.[25] Her white-blood cell count was 9.7 (within the normal reference range of 3.5–12.4), she had no fever, her respiratory rate was a slightly elevated 22, her oxygen saturation was 96%, her breathing was much improved, and her ECG was normal, with a "sinus rhythm rate of 87 and no over ischemic changes suggesting heart attack."[26] Dr. Ruiz's review of the chest X-Ray and ECG revealed "no overt ischemic changes signifying issues of oxygen flow in veins, arteries or blood vessels, or an issue of cardiac intervention. The exam and x-ray findings established that [she] was not suffering from adult respiratory distress syndrome, early congestive heart failure, or pulmonary edema."[27] Radiologist James Kang, M.D., confirmed that Ms. Crawford was not suffering from pleural effusion or pneumothorax.[28] Her chest X-ray showed normal cardio mediastinal contours and her infection's

---

[21] Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 57.

[22] Ruiz Decl. – ECF No. 77 at 248 (¶ 15); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 57.

[23] Ruiz Decl. – ECF No. 77 at 248 (¶ 15).

[24] *Id*. (¶ 16); West Decl. – ECF No. 77 at 277.

[25] Ruiz Decl. – ECF No. 77 at 248 (¶ 17).

[26] *Id*. at 248–49 (¶¶ 17–19); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 62–63.

[27] *Id*. at 249 (¶ 19).

[28] *Id*.

improvement since her previous visit.[29] At 8:05 p.m., Dr. Ruiz cleared the plaintiff as stable and within medical probability did not believe her physiology or pathology indicated that she would deteriorate if she were transferred or discharged.[30] She had no objective symptoms or signs of an unstable medical condition that would have benefited from intravenous fluid or medication available in inpatient care.[31] But because she had returned to the emergency department after such a short period, had a history of splenectomy (making her more prone to bacterial infection), and had not taken the previously prescribed outpatient medication, Dr. Ruiz referred Ms. Crawford for an inpatient consultation with a Kaiser hospitalist, Stella Abhyankar, M.D.[32]

Dr. Abhyankar reviewed Ms. Crawford's medical chart and test results and examined her at 8:40 p.m.[33] She made the clinical decision to monitor her overnight given her history of splenectomy and her return to the emergency department in a short time frame.[34] She planned to observe her overnight and provide her with drugs, supplies, and services (including nursing, medical, diagnostic, and therapeutic services), and she made the corresponding orders for these services.[35] This was the same treatment a patient would receive if she were admitted as an inpatient (for two midnights).[36] She ordered repeat screenings from the tests that Ms. Crawford had in the emergency department, including complete blood counts, white-blood cell counts, Chem-7 exam, vital-sign monitoring, and troponin I tests, and she ordered cultures to be returned in the next several days (a gram stain for bacteria, sputum cultures, and respiratory influenza A/B.[37] The results from the Chem-7, complete blood count, and white-blood count tests were

---

[29] *Id.* (¶ 20); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 62.

[30] Ruiz Decl. – ECF No. 77 at 249 (¶ 21); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 63.

[31] Ruiz Decl. – ECF No. 77 at 249 (¶ 21).

[32] *Id.* (¶ 22); Abhyankar Decl. – ECF No. 77 at 255 (¶¶ 9–10).

[33] Abhyankar Decl. – ECF No. 77 at 255 (¶¶ 9–10).

[34] *Id.* (¶¶ 10–11).

[35] *Id.* (¶ 10).

[36] *Id.*

[37] *Id.* (¶ 11).

normal at 6:56 a.m. and 7:14 a.m., and the nurses who monitored her vital signs did not report any abnormalities.[38] She had antibiotics administered at 8:40 p.m., 9:10 p.m., 6:10 a.m. (on March 26, 2017), 9:46 a.m., and 10:16 a.m., and she received the antiviral Tamiflu at 11:45 p.m. and 9:45 a.m. (to treat her reported fever).[39]

At around midnight, Ms. Crawford asked for Dr. Abhyankar because she had a coughing spell, which caused her to feel anxious and short of breath.[40] Her oxygen saturation was normal at 97% on three liters of oxygen.[41] When Dr. Abhyankar arrived in her room, Ms. Crawford was sitting in bed and watching TV.[42] Her wheezes had improved.[43] Based on the examination and the normal bloodwork results, Dr. Abhyankar concluded that "non-pharmacologic means for controlling [the] breathing should be used."[44] She taught Ms. Crawford controlled-breathing techniques including "pursed lipped breathing and calming techniques."[45] Dr. Abhyankar determined that anxiety and reactive airway disease caused the shortness of breath.[46] Like Dr. Ruiz, she diagnosed Ms. Crawford with community-acquired pneumonia and reactive airway disease.[47]

Based on the record and examinations, Dr. Abhyankar did not find that Ms. Crawford showed emergency conditions or needed immediate medical attention.[48]

On March 26, 2017, Ashwini Peruri, M.D., the hospitalist on duty, had an in-person consultation with Ms. Crawford.[49] Ms. Crawford had received repeated doses of antibiotics,

---

[38] *Id*. at 256 (¶¶ 13–15).

[39] *Id*. (¶ 13).

[40] *Id*. (¶ 16).

[41] *Id*.; Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 75.

[42] Abhyankar Decl. – ECF No. 77 at 256 (¶ 16).

[43] *Id*.

[44] *Id*.

[45] *Id*. at 257 (¶ 17); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 75.

[46] Abhyankar Decl. – ECF No. 77 at 257 (¶ 18).

[47] Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 68.

[48] Abhyankar Decl. – ECF No. 77 at 257 (¶ 21).

[49] Peruri Decl. – ECF No. 77 at 263–64 (¶ 11).

antivirals, and steroids and medical screenings to identify any dangerous causes of her reported signs and symptoms and any need for immediate medical attention or to prevent serious bodily injury.[50] Ms. Crawford "was exhibiting no such emergency; [her] tests were returning normal:" (1) her oxygen saturation was normal throughout her stay (93% to 97% and never dropping below the abnormal 90% level); (2) her heart rate was recorded at 69, 72, 73, and 72 beats per minute; and (3) her respiration rates were normal at 8:00 a.m. and at 9:28 a.m.[51] She had no rales or wheezing, had a regular heart rate and rhythm, and had no chest pain, diarrhea, vomiting, abdominal pain, or leg swelling. [52] During her stay, Ms. Crawford "had episodes of tachypnea without hypoxia that resolved within a few seconds/minutes."[53]

Based on Ms. Crawford's history, the examination, the imaging studies, the test results, the vital signs, the response to medication, and other factors, Dr. Peruri diagnosed Ms. Crawford with community-acquired pneumonia, reactive airway disease, and a history of splenectomy and determined that she was experiencing an already-improving pneumonia, with an exacerbation of her symptoms due to anxiety and asthma.[54] More medically likely than not, her condition was mild enough to treat with home care and follow-up outpatient visits "because her testing and monitoring continually returned as unremarkable."[55] Dr. Peruri thus discharged Ms. Crawford as "medically stable to return home" at 11:35 a.m.[56] The discharge instructions included a pre-discharge ambulatory pulseox to make sure that Ms. Crawford was not clearly hypoxemic with exertion, instructions about symptoms requiring a return to the hospital, outpatient follow-up to address shortness of breath, anxiety, and Ms. Crawford's pulmonary concerns (in addition to Dr. Ruiz's outpatient follow-up for the lung infection), and prescriptions for Atrovent, Azithromycin,

---

[50] *Id*. at 262–63 (¶¶ 8–12).

[51] *Id*. at 263 (¶ 10).

[52] *Id*. at 264 (¶ 11); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 70.

[53] Peruri Decl. – ECF No. 77 at 264 (¶ 11).

[54] *Id*. at 264 (¶ 12).

[55] *Id*.

[56] *Id*. (¶ 13); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 70.

Cefuroxime Axetil, and Prednisone.[57] She also ordered a social-worker consult to address Ms. Crawford's complaints about her care.[58]

To this last point, Ms. Crawford complained to Drs. Abhyankar and Peruri about her frustrations with the insurance and healthcare systems.[59] She complained to the social worker that she did not receive proper medical care because she is on Medi-Cal and that "[M]ediCal is fraudulent and racist [because it] provid[es] services to immigrants and homeless people but not her."[60] The social worker tried to refer Ms. Crawford to primary-care services, but Ms. Crawford refused because emergency departments "cannot refuse services," and she was not receptive to the suggestion that emergency rooms cannot manage care on an ongoing basis.[61]

**3. Stanford Visit and March 30, 2017 Kaiser Visit**

Several hours after her discharge, Ms. Crawford called for an ambulance and asked to be taken to Stanford for shortness of breath and chest pressure.[62] American Medical Response arrived at 4:43 p.m.: Ms. Crawford was ambulatory, "moderately short of breath" with a slightly high respiration rate of 30 and normal oxygen saturation of 90% on room air.[63] After she was given Albuterol (something that she was allergic to, as Kaiser records show), it spiked her lactic acid rate, as shown by her oxygen saturation rate rising to 97%.[64] She arrived at Stanford at 5:18 p.m., complaining of shortness of breath and a cough, and had no rales or respiratory distress but exhibited wheezes.[65] Her white-blood count was 13.9 (normal maximum is 12.5), with a lactic

---

[57] *Id.* at 264–65 (¶ 14).

[58] *Id.* (¶ 15).

[59] Abhyankar Decl. – ECF No. 77 at 254 (¶ 4); Peruri Decl. – ECF No. 77 at 262 (¶ 4); Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 69.

[60] Social Services Record, Ex. 2 to Aguiar Decl. – ECF No. 77 at 77.

[61] *Id.*

[62] *See* Stanford Records, Ex 11 to Ferrante Decl. – ECF No. 77 at 356, 358.

[63] *Id.* at 358.

[64] *Id.*

[65] *Id.* at 355.

United States District Court
Northern District of California

acid of 2.19.[66] Stanford admitted her as an inpatient (for over two midnights), administered various tests, and gave her the same medications that she received at Kaiser, namely Azythromycin, Predisone, and Albuterol/Atrovent inhalers.[67] "[U]ltimately, she was thought to have a community-acquired pneumonia v. acute bronchitis 2/2 a viral infection."[68]

Ms. Crawford returned to Kaiser on March 30, 2017 complaining of shortness of breath (reportedly caused by her stress, her body position, and Albuterol), would not allow a nurse to draw blood, allowed a phlebotomist to withdraw blood, had not filled her prescriptions, walked with no acute shortness of breath, was angry, complained about state insurance and hospitals, pulled out her IV, refused to speak with staff, and left, refusing to sign "Against Medical Advice" paperwork.[69] The blood culture drawn that day revealed no growth at five days.[70]

**4. Expert Declaration— Hugh West, M.D.**

Dr. West is an emergency-room physician and a former Associate Professor of emergency medicine in the Department of Emergency Medicine at the University of California, San Francisco School of Medicine ("UCSF").[71] Based on his review of the medical records and his professional experience, Dr. West opined that Ms. Crawford "was stable after Kaiser provided her with the evaluation and assessment and testing and treatment administered prior to her discharge" on March 26, 2017.[72]

---

[66] *Id*. at 356.

[67] *Id*. at 357.

[68] *Id*.

[69] Med. Records, Ex. 2 to Aguiar Decl. – ECF No. 77 at 173, 175–76.

[70] *Id*. at 184–86.

[71] West Decl. – ECF No. 77 at 268 (¶ 2). His curriculum vitae shows the following initials after his name: "S.A.E.M." (the Society of Academic Emergency Medicine); F.A.A.E.M." (Fellow of the American Academy of Emergency Medicine), and "F.A.C.E.P" (Fellow of the American College of Emergency Physicians). West Curriculum Vitae – ECF No. 77 at 334.

[72] West Decl. – ECF No. 77 at 278 (¶ 12). The court considers the expert declaration. At summary judgment, an expert declaration must meet two tests: (1) the opinion expressed must be admissible under Federal Rules of Evidence 702 and 703, and (2) the declaration must contain "facts that would be admissible in evidence" and "show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). As to (2), an "[e]xpert opinion is admissible and may defeat

His qualifications are as follows. He is board-certified in emergency medicine by the American Board of Emergency Medicine.[73] He has served on the emergency-medicine faculty at UCSF, worked as the Director of the Emergency Department at Santa Rosa Memorial Hospital, and served as an examiner for the American Board of Emergency Medicine.[74] He has "actively engaged in the clinical practice of Emergency Medicine" for the past 45 years.[75] He has "authored over 22 publications, primarily in the field of Emergency Medicine."[76] He is familiar with the EMTALA standards for providers, including "the determination of the presence of an 'Emergency Medical Condition' [and] what treatment must be provided to 'stabilize' that Emergency Medical Condition to ensure — within reasonable medical probability — that no material deterioration of the patient's condition is likely to result from or occur during the transfer to another facility or discharge from the hospital."[77] He has taught trainings to clinicians on EMTALA's standards.[78]

Dr. West opined that — based on Ms. Crawford's unremarkable screenings of vital signs, the test results, the lactic-acid rates, the chest X-rays, the ECGs, and the medicine provided (intravenous fluid, antibiotics, antivirals, and steroids, including Prednisone, Atrovelt, Cefrotrix, and Acetaminophen) — Kaiser appropriately screened and stabilized her pneumonia, and she required no ongoing emergency medical treatment.[79] Thus, she was stable on discharge.[80] Dr. West made the following specific findings.

---

summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based is not." *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007), *superseded by statute on other grounds as stated in Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018). Dr. West's opinions meet these tests.

[73] West Decl. – ECF No. 77 at 269 (¶ 4).

[74] *Id.*

[75] *Id.*

[76] *Id.* (¶ 5).

[77] *Id.* at 269–70 (¶ 6).

[78] *Id.* at 269 (¶ 5); West Curriculum Vitae – ECF No. 77 at 287–334.

[79] West Decl. – ECF No. 77 at 278–79 (¶ 12).

[80] *Id.*

First, Ms. Crawford "received an excellent [m]edical [s]creening [e]xamination to determine whether she had an [e]mergency [m]edical [c]ondition manifesting itself."[81] Based on her symptoms at intake, the appropriate screening included taking her medical history and performing a physical examination, complete-blood count, a chest X-Ray, and an ECG. Kaiser's doctors performed these steps.[82]

Second, "[t]here is no evidence that the Plaintiff received disparate treatment, nor any treatment that would be different from other patients presenting with the same or similar signs and symptoms."[83]

Third, Dr. West attested that, based on Dr. Ruiz's examination and the chest X-Ray results on March 25, 2017, "[i]t would have been proper for Dr. Ruiz to release the Plaintiff and allow her to go home as stable at that juncture."[84] Dr. Ruiz's and Dr. Abhyankar's decision to observe Ms. Crawford overnight was a "careful [and] conservative management."[85] "In situations where a patient with asthma[,] who is already on antibiotics and steroids[,] presents with mild to moderate symptoms, no fever, no rales and no chest pain, especially with a normal [complete blood count] CBC and an improving chest [X-R]ay, and receives additional treatment in the Emergency Department, discharge from the hospital for continued outpatient management would be the usual outcome."[86] Because Ms. Crawford was feeling anxious about her symptoms, it was "exemplary and the very best practice for Kaiser's physician to take [her] anxiety about her symptoms seriously" and admit her for observation.[87] Kaiser's evaluation and treatments were "all that was

---

[81] *Id*. (¶ 13).

[82] *Id*.

[83] *Id*. at 279–80 (¶¶ 15–16).

[84] *Id*. at 280 (¶ 17).

[85] *Id*.

[86] *Id*. at 281 (¶ 18).

[87] *Id*.

United States District Court
Northern District of California

necessary to manage the patient's presentation conservatively and carefully."[88] This treatment was within the standard of care.[89]

Fourth, "[i]t is medically probable [and] likely that Plaintiff's outcome would not have been any different or improved in any way if she [had] been kept in [Kaiser's] hospital for a longer period of time."[90] Ms. Crawford's test results were unremarkable and, despite her subjective report of shortness of breath, "her oxygen saturation was normal on both room air and oxygen."[91] "Based on the totality of the medical evaluation, it was a reasonable medical probability that Plaintiff no longer required treatment, and therefore, Dr. Peruri correctly certified Plaintiff as stable and ordered her to be discharged, with appropriate follow-up and resources in the out-patient arena."[92]

Fifth, Dr. West noted that Ms. Crawford was not exhibiting signs of sepsis or a bloodborne infection, as evidenced by her unremarkable test results.[93]

Sixth, "[w]ithin reasonable clinical confidence and reasonable medical probability, the Plaintiff was not likely to deteriorate significantly after discharge, nor did she deteriorate significantly based on the information in the Kaiser and Stanford medical records."[94] The Stanford medical records show that Ms. Crawford had only showing moderate shortness of breath. The elevated lactic acid at Stanford's records resulted from the EMT's administering Albuterol. Her initial screening for sepsis was based on symptoms that were not present when she was at Kaiser. "[U]ltimately the Stanford providers reached the same conclusion as the Kaiser providers, that the Plaintiff probably had a community[-]acquired pneumonia," and her cultures came back negative.[95] "To a medical probability, the elevated lactate was due to the albuterol treatment and

---

[88] *Id.* (¶ 19).

[89] *Id.*

[90] *Id.* at 281 (¶ 20).

[91] *Id.* at 281–82 (¶ 20).

[92] *Id.* at 282 (¶ 20).

[93] *Id.* (¶ 21).

[94] *Id.* at 283 (¶ 24).

[95] *Id.*

the abnormal vital signs were stress related."[96] Ms. Crawford likely had a "mild deterioration" in her conditions (because asthma conditions can fluctuate), but "[t]here is no way such a deterioration could be predicted or prevented by the Kaiser medical providers."[97]

**5. Relevant Procedural History**

Ms. Crawford filed her complaint on March 26, 2019, alleging that Kaiser violated EMTALA by failing to stabilize her before discharging her.[98] Kaiser moved to dismiss her amended complaint for failure to state a claim, but the court denied the motion on the ground that she plausibly pleaded an EMTALA claim against the hospital.[99] (The court dismissed Kaiser Health Plan, which is not a hospital and thus cannot be sued under EMTALA.[100])

Kaiser moved for summary judgment before fact discovery closed.[101] The court appointed pro bono counsel and granted Ms. Crawford's motion under Fed. R. Civ. P. 56(d) to postpone the due date for her opposition.[102] Ultimately, pro bono counsel withdrew based on a conflict with Ms. Crawford.[103] The parties' relationship during discovery has been contentious.[104]

After fact discovery closed, Kaiser renewed its summary-judgment motion.[105] Ms. Crawford did not file an opposition on its due date of June 4, 2020 and instead filed another Rule 56(d) motion asking to extend discovery for 90 days.[106] Discovery has been extensive and included production of the medical records, depositions of Ms. Crawford and her roommate, and written

---

[96] *Id.*

[97] *Id.*

[98] Compl. – ECF No. 1; FAC – ECF No. 16.

[99] Order – ECF No. 42 at 14–21.

[100] *Id.* at 2.

[101] Mot. – ECF No. 76.

[102] Order – ECF No. 70; Clerk's Notice – ECF No. 84; Order – ECF No. 111.

[103] Order – ECF No. 95.

[104] Orders – ECF No. 104, 105, 114.

[105] Notice – ECF No. 117; Scheduling Order – ECF No. 82.

[106] Crawford Decl. – ECF No. 122.

United States District Court
Northern District of California

discovery in the form of Kaiser's responses to Ms. Crawford's requests for admissions.[107] The court thus denied the motion to extend discovery (essentially for lack of good cause under Rule 16(b)) but extended Ms. Crawford's deadline to oppose Kaiser's motion to June 30, 2020.[108] Ms. Crawford did not file an opposition or statement of non-opposition. *See* Civil L. R. 7-3(a)–(b). The court twice referred Ms. Crawford to the court's resources for litigants representing themselves (including the court's help desk and pro se handbook), and it advised her of the standards for summary judgment.[109]

All parties consented to the court's jurisdiction.[110]

## SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is enough evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,

[107] Simonson Decl. – ECF No. 121-1 at 6 (¶ 20); Email serving RFA responses, Ex. W to Simonson Decl. – ECF No. 121-2 at 147.

[108] Order – ECF No. 124.

[109] Orders – ECF Nos. 4, 104.

[110] Consents – ECF Nos. 6, 14.

210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**ANALYSIS**

Kaiser moves for summary judgment on the grounds that Ms. Crawford had no emergency medical condition, and Kaiser in any event stabilized her before discharging her.[111] The court grants the motion.[112]

"EMTALA imposes two duties on hospital emergency rooms: a duty to screen a patient for an emergency medical condition, and, once an emergency condition is found, a duty to stabilize the patient before transferring or discharging him." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 992

---

[111] Mot. – ECF No. 76 at 20–29.

[112] Ms. Crawford did not oppose Kaiser's motion, but the court nonetheless considers the motion on the merits. *See U.S. v. Honeywell Int'l, Inc.*, 542 F. Supp. 2d 1188, 1202 (E.D. Cal. 2008) ("Since [] Rule [56] is not cast in the mandatory posture of 'shall,' and since it allows for a finding of appropriateness, the Court is not obligated to grant every motion opposed by procedurally deficient papers. Where, as here, an opposition is deemed lacking, [the] Court may still deny summary judgment").

United States District Court
Northern District of California

(9th Cir. 2001) (citing 42 U.S.C. § 1395dd; *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254–55 (9th Cir. 2001)).

EMTALA defines an "emergency medical condition" in relevant part as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in —
>
> (i) placing the health of the individual . . . in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A). Under EMTALA,

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either —
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1). EMTALA defines "to stabilize" in relevant part as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1395dd(e)(3)(A).

EMTALA further provides that "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual," absent certain exceptions not at issue here. 42 U.S.C. § 1395dd(c)(1). The term "transfer" includes discharging a patient from a hospital. 42 U.S.C. § 1395dd(e)(4).[113]

---

[113] An issue at the motion to dismiss was whether admitting Ms. Crawford for observation was the equivalent of admitting her as an inpatient. Order – ECF No. 42 at 12–18. Kaiser does not argue that it admitted Ms. Crawford as an inpatient and instead contends only that she did not have an emergency condition and in any event, she was stabilized before discharge. Mot. – ECF No. 76 at 20–29.

The uncontroverted evidence shows that Ms. Crawford did not have an emergency medical condition, and even if she did, Kaiser stabilized her before it discharged her.

First, the uncontroverted medical evidence shows that Ms. Crawford did not have an emergency medical condition as it is defined in the statute. 42 U.S.C. § 1395dd(e)(1)(A). She was screened at intake.[114] That screening included her history, several physical examinations, tests, chest X-rays, and ECGs. Her test results were unremarkable and normal. She showed no signs of sepsis. Nothing in the record suggests a medical condition with "acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in" placing her health in serious jeopardy, risking serious impairment to bodily functions, or risking serious dysfunction of any bodily organ or part. *Id.*

Second, the undisputed evidence shows that Kaiser in any event stabilized her before it discharged her. Again, she received several physical examinations, many tests, and treatment (including intravenous fluid, antibiotics, antivirals, and steroids). Her tests were normal, and her conditions improved and were mild enough to be treated with home care and outpatient follow-up. Kaiser discharged her with appropriate instructions, including medication and a recommendation for treatment by her primary-care physician. In sum, the undisputed evidence shows that Kaiser stabilized Ms. Crawford by providing medical treatment that assured, within reasonable medical probability, that no material deterioration of Ms. Crawford's condition was likely to result from her discharge. *Id.* § 1395dd(e)(3)(A).

**CONCLUSION**

The court grants Kaiser's summary-judgment motion.

**IT IS SO ORDERED.**

Dated: July 21, 2020

LAUREL BEELER
United States Magistrate Judge

[114] FAC – ECF No. 16 at 9 (¶ 45) (Ms. Crawford concedes that she "was given an adequate screening in the Emergency Room").